IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. 23-443 (RC) |
| v. | MAGISTRATE NO. 23-MJ-58 (ZMF) |
| ELLIOT RESNICK, | VIOLATION: |
| | 18 U.S.C. § 231(a)(3) |
| Defendant. | (Civil Disorder) |

## STATEMENT OF OFFENSE

Pursuant to Fed. R. Crim. P. 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Elliot Resnick, with the concurrence of the defendant's attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

*The Attack at the U.S. Capitol on January 6, 2021*

1. The United States Capitol, which is located at First Street, SE, in Washington, D.C., is secured twenty-four hours a day by U.S. Capitol Police (USCP). Restrictions around the Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the Capitol.

2. On January 6, 2021, the exterior plaza of the Capitol was closed to members of the public and a joint session of the United States Congress convened at the Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on Tuesday, November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m.,

the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael Richard Pence was present and presiding, first in the joint session, and then in the Senate chamber.

3. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol. Temporary and permanent barricades, as noted above, were in place around the exterior of the Capitol, and USCP officers were present and attempting to keep the crowd away from the Capitol and the proceedings underway inside. By shortly after 1:00 p.m., the situation at the Capitol had become a civil disorder as that term is used in 18 U.S.C. § 231, and throughout the rest of the afternoon the civil disorder obstructed the Secret Service's ability to perform the federally protected function of protecting Vice President Pence.

4. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades. Officers of the USCP were forced to retreat and the crowd advanced to the exterior façade of the building. Officers with the D.C. Metropolitan Police Department were called to assist officers of the USCP who were then engaged in the performance of their official duties. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks as required by USCP officers or other authorized security officials.

5. At such time, the certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:10 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted

those acts. The riot resulted in substantial damage to the Capitol, requiring the expenditure of more than $2.9 million dollars for repairs.

6. Shortly thereafter, at approximately 2:20 p.m., members of the House of Representatives and of the Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. on January 6, 2021. Considering the dangerous circumstances caused by the unlawful entry to the Capitol—including the danger posed by individuals who had entered the Capitol without any security screening or weapons check—Congressional proceedings could not resume until after every unauthorized occupant had been removed from or left the Capitol, and USCP confirmed that the building was secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

7. On January 6, 2021, Elliot Resnick was the Chief Editor of *The Jewish Press*, a news media organization. He did not travel to Washington, D.C., in his official capacity, nor was he acting in his official capacity as Chief Editor during any of the actions or events below. He traveled via bus from New York City to Washington, D.C., in the early morning hours of January 6. He arrived at the east side of the United States Capitol in the early afternoon, after the outer layer of barricades had been breached. Resnick and others rushed forward up the East Front staircase of the Capitol. When Resnick was on the staircase, he turned back to the crowd and waved others forward and up the steps.

8. Once at the top of the stairs, Resnick and the rioters began arguing and scuffling with police officers from the U.S. Capitol Police that were attempting to keep rioters away from the East Rotunda Doors and out of the Capitol. The rioters pressed forward, and some rioters assaulted police officers. The officers used various means to attempt to push the rioters back and away from the door, including the use of a chemical irritant, sometimes called oleoresin capsicum (OC) spray or pepper spray. At one point, as Sgt. D., a police Sergeant, raised his arm to deploy OC spray against other rioters, and in response, Resnick reached up and grabbed Sgt. D.'s arm with the intended purpose of obstructing, impeding, or interfering with him.

9. Rioters from inside the Capitol were able to push one of the two East Rotunda Doors open from inside, and at approximately 2:26 p.m., Resnick entered the Capitol through the one open door. Almost immediately after entering the Capitol, Resnick turned back to the East Rotunda Doors and pushed on the closed second door, attempting to open it. At least one police officer attempted to keep the door closed from the outside. As Resnick and others were pushing on the closed door, a different USCP Officer, Officer B., approached Resnick and attempted to stop him from pushing on the door. While doing so, another rioter grabbed Officer B. from behind and threw him to the ground. After Resnick failed to push open the southern door of the East Rotunda Doors, which was closed, he reached through the open northern door and, using his arms, grabbed other rioters and pulled them past the police that were trying to keep rioters out, and into the Capitol.

10. Once inside the Capitol, Resnick proceeded to different areas, joining groups of rioters in the Grand Rotunda (2nd floor), the hallway just outside the House Chamber (2nd floor), the Crypt (1st floor), and the Capitol Visitor Center (sub-level 1). At approximately 2:45 p.m., Resnick returned to the East Rotunda Doors, both of which were now fully open, and gestured and

beckoned rioters outside to come inside. Resnick also once again reached across the threshold, grabbed other rioters, and ushered them across the threshold and into Capitol. RESNICK repeated this process several times. USCP surveillance video also shows Resnick patting others on the back in a congratulatory manner as he successfully helped them to enter.

11. Resnick then returned to the Grand Rotunda and took out his cellphone to take pictures. Shortly after, police officers from the US Capitol Police and the D.C., Metropolitan Police Department began forcefully moving the rioters out of the Grand Rotunda and pushing them out of the Capitol. Resnick remained inside, occasionally talking with other rioters. Resnick did not leave the Capitol until approximately 3:14 p.m., after he had been inside the Capitol for approximately fifty minutes. Even after leaving the Capitol, though, Resnick did not leave, but instead remained with the other rioters on the restricted grounds of the Capitol. The body worn camera of a police officer from MPD shows Resnick amongst the rioters on restricted grounds on the opposite side of the Capitol, the West Front, at approximately 4:18 p.m.

### *Elements of the Offense*

12. The parties agree that a violation of 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, requires the following elements:

> First, the defendant knowingly committed an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.
>
> Second, at the time of the defendant's act, the police officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.
>
> Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected commerce or the movement of any article or commodity in commerce, or the conduct or performance of any federally protected function.

13. The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another

individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.

14. The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia. It also means commerce wholly within the District of Columbia.

15. The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof.

16. The term "department" includes one of the departments of the executive branch (such as the Department of Homeland Security, which includes the United States Secret Service) or the legislative branch. The term "agency" includes any department, independent establishment, commission, administration, authority, board, or bureau of the United States. The term "instrumentality" includes any other formal entity through which the government operates, such as Congress or the United Sates Capitol Police.

17. For the U.S. Capitol Police and Metropolitan Police Department on January 6, 2021, the term "official duties," means policing the U.S. Capitol Building and Grounds, and enforcing federal law and D.C. law in those areas.

18. A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident.

*Defendant's Acknowledgments*

19.   The defendant knowingly and voluntarily admits to all the elements as set forth above. Specifically, the defendant admits that when he obstructed Sgt. D. during the civil disorder at the Capitol on January 6, 2021, he did so in a way that involved physical contact.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By: _____
SEAN P. MURPHY
Assistant United States Attorney
Detailee, Capitol Siege Section
N.Y. Bar Reg. No. 5321617
Torre Chardon, Ste 1201
350 Carlos Chardon Ave
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov

## DEFENDANT'S ACKNOWLEDGMENT

I, Elliot Resnick, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 12/14/23                           _Elliot Resnick_
                                         Elliot Resnick
                                         Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 12/15/2023                         _Clay H. Kaminsky_
                                         Clay H. Kaminsky
                                         Attorney for Defendant

Page 8 of 8