**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 23-CR-443 (RC)** |
| **ELLIOT TZVI RESNICK,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Elliot Resnick to eleven months' incarceration, two years' supervised release, $2,000 in restitution, and the mandatory special assessment fee of $100. The Guidelines range, as calculated by the government and the Presentence Investigation Report[1] is eight to fourteen months' incarceration. The government recommends a midpoint sentence within this range. An eleven-month sentence would be sufficient but no longer than necessary to account for Resnick's participation in the riot and an apt reflection of his utter lack of remorse for his actions on January 6, 2021.

## I.    INTRODUCTION

Elliot Resnick should go to prison. Despite being highly educated, and despite being raised in a stable and loving family environment, Resnick chose to take an active role in a dark day in our nation's history. He could have and should have stopped at dozens of points before he grabbed a police officer's wrist and then knowingly and illegally entered the U.S. Capitol during a riot. His

---

[1] ECF No. 31, p. 15, ¶ 82.

actions and those of the mob that day were both a literal attack on the seat of our nation's legislative branch and a figurative onslaught against America's proud and precedential tradition of a peaceful presidential transfer of power. The collective actions of the rioters injured more than one hundred police officers and resulted in more than 2.9 million dollars in damage and losses.[2]

As Resnik wrote on the now-defunct social media website Parler, "If the Democrats get away with their crimes, there's nothing to stop them from cheating in future elections. Why shouldn't amoral operatives cheat if there are no consequences?" Resnick apparently decided that he was the right person to deliver those consequences.

After listening to the former president, Resnick went to the Capitol because he wanted to get inside and yell at the politicians so that they would know how angry he was. He not only joined the mob but pushed to the front and situated himself by the starkly outnumbered police trying to protect the entrance. He waived and encouraged others to join him because there were only a handful of police officers; a larger crowd improved their chances of getting past the officers. As one police officer attempted to disperse the crowd using a chemical irritant, Resnick made physical contact by grabbing the officer's wrist and pulling down. Rioters from inside the Capitol succeeded in pushing the East Rotunda Doors open, and despite knowing that what he was doing was illegal,[3] Resnick forced his way into the Capitol.

---

[2] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[3] Resnick confirmed in a post-conviction interview with the FBI that RESNICK knew that he and others were not supposed to go inside the U.S. Capitol. He knew it was illegal to go inside the way he went inside. He knew it was breaking the law to go inside.

Once inside the Capitol, Resnick continued working against the efforts of the police officers. He pushed against and tried to open the second of the two doors on the East Front of the Capitol, and then reached over the police line and pulled other rioters past the police and into the Capitol. Resnick then went looking for "the politicians." He also looked for doors or other ways to allow other rioters into the Capitol, and even returned to the East Rotunda Doors and pulled additional rioters from outside the Capitol past the police line and into the building.

As reinforcements arrived, the police regained the upper hand. They forced Resnick and other rioters out of the Capitol. Resnick refused to leave the Capitol grounds and instead made his way to the West Front of the Capitol where rioters continued to attack police officers in a location known as The Tunnel. Resnick is not believed to have had any further contact with police and returned home to New York City that evening on a bus.

That evening, a user on X (the platform formerly known as Twitter) denounced the violence of January 6 and suggested it was time  to "step back, regroup and win back our nation." Resnick demanded the poster "[p]lease explain how you plan on making sure Democrats don't cheat four years from now." Even 18 months after January 6, Resnick continued to advocate violence as an appropriate response to legal process, posting: "If the left tries to arrest Trump, Trump should call for 50,000 of his followers to surround his house with guns." Despite losing his job and becoming a convicted felon, the government has yet to see Resnick make any meaningful expression of regret or remorse.

The government recommends that the Court sentence Resnick to eleven months of incarceration for his conviction of violating 18 U.S.C. 231(a)(3).

## II.    FACTUAL BACKGROUND

### A.  The January 6, 2021, Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 26, for a short summary of the January 6, 2021, attack on the United States Capitol by thousands of rioters, an attack that disrupted the peaceful transfer of power after the November 3, 2020, presidential election.

### B.  Elliot Resnick's Role in the January 6, 2021, Attack on the Capitol

On January 6, 2021, Resnick took a Megabus from New York City to Washington, D.C., arriving at approximately 8:30 a.m. Resnick first listened to the former president's speech and then made his way to the Capitol with the rest of the crowd. Resnick knew that there would be a rally at the Capitol following the rally at the National Mall, and he knew that January 6 was the day that Congress would be certifying the vote of the Electoral College.

The YouTube video entitled "Eastside Capital Building 1/6/21" shows Resnick's approach to the Capitol via the East Plaza and Central East steps.[4] Notably, Resnick is visible in the video as rioters broke through the police line on the Central East Steps and advanced up the stairs. He moved with the crowd and repeatedly gestured for others to come up the stairs.

---

[4] https://youtu.be/ZjLvYqJ2-EM?t=1141



*Image 1: Screenshot from YouTube video "Eastside Capital Building 1/6/21" (fn. 3) showing RESNICK waving rioters forward.*



*Image 2: A second screenshot from YouTube video "Eastside Capital Building 1/6/21" (fn. 3) showing RESNICK waving rioters forward.*

Resnick subsequently explained in a post-plea interview[5] that he wanted to get inside of the U.S. Capitol building because the point of the protest was to pressure the politicians and influence them to not certify the vote. He did not believe politicians would know how many or how upset the people were if Resnick and other protestors did not get inside. Personally, Resnick recalled his desire to get inside and scream at the politicians, which Resnick felt would be effective as people do not usually get into the U.S. Capitol and directly confront politicians in such large numbers.

A publicly available photograph[6] shows RESNICK just south of the East Rotunda Doors on January 6, 2021.



*Image 3: A photograph taken by a Getty Images photographer that shows RESNICK and other rioters in front of the East Rotunda Doors.*

---

[5] As was required by the plea agreement. ECF No. 25, § 2.

[6]   https://www.gettyimages.com.br/detail/foto-jornal%C3%ADstica/demonstrators-clash-with-u-s-capitol-police-officers-foto-jornal%C3%ADstica/1230455112.

In his interview with the FBI, Resnick initially estimated the number of police officers, whom he referred to as "guards," to be 10 to 15. He later amended that number to ten but explained that after they "turned heel and ran" back up the stairs, five additional "guards" joined them. Resnick reaffirmed that he knew that the police officers would be overrun by the huge group of rioters and that the officers had no chance of holding off the crowd. He acknowledged that he occasionally waved the crowd forward because he knew that they could overpower the police and get inside.

USCP Sgt. D. was present on the East Steps of the Capitol on January 6 and specifically recalled telling Resnick in sum and substance that he should "leave and go home." Sgt. D. also recalled Resnick answered him by stating that he was not leaving, and that although he did not want to hurt Sgt. D. or other officers, he and the other rioters were coming through. Sgt. D. recalled Resnick insisting that the officers needed to get out of the way.

Resnick claimed that while the rioters were scuffling with the police, he recovered what he believed to be a clip of bullets that had fallen to the floor and returned them to a police officer. The government could not find a police officer that specifically remembered Resnick returning a clip of bullets to them.

Two open-source videos ("Parler Video" and "Archive.Org Video" [7]) contain scenes from overlapping time periods filmed from different vantage points. Both videos show Resnick reaching up, grabbing, and holding the arm of Sgt. D., who was at the time attempting to deploy a chemical irritant to keep rioters from entering the U.S. Capitol. The videos show another USCP officer ("Officer R.") pushing down on Resnick's arm to remove his hand from Sgt. D.'s arm.

---

[7]      https://archive.org/download/DitvdKNtPaTAtEGXo/Trump_Supporters_Gather_A.mpeg4 (beginning at approx. 8 min. 50 sec.).

  

*Images 4a, 4b, and 4c (left to right)—Screenshots from the Parler Video showing Resnick standing just south of the East Rotunda Doors; Resnick reaching up towards the arm of a USCP officer who was attempting to spray rioters with a chemical irritant; and Resnick grabbing and holding the wrist of the same law enforcement officer.*



*Image 4d—A close-up of the screenshot from the Parler Video which shows the moment when Resnick reached up and grabbed the wrist of a USCP officer.*





*Images 5 and 5a: (top) A screenshot from the Archive.Org Video showing Resnick grabbing the arm of a USCP officer; and (bottom) a close-up of that same screenshot.*

Resnick entered the U.S. Capitol at approximately 2:26 p.m. on January 6, 2021, through the East Rotunda Doors—one of the very first rioters to do so.[8] Resnick subsequently referred several times to his position vis-à-vis the other rioters as on the "front lines."

---

[8] *See* https://youtu.be/V-fkunG5J6k?t=525.

The East Rotunda Doors have two doors for entry or exit. Importantly, however, these doors are not intended for use by the public, staff, or members of Congress. They do not have x-ray machines, magnetometers, or any security screening equipment. The only time the doors should be used is to exit the Capitol during an emergency.

When Resnick pushed his way through the bottleneck and into the Capitol, one door was open, and the other door was closed. Open-source video shows that just after Resnick entered, another rioter yelled for assistance with the other door. Almost immediately, Resnick turned back to the East Rotunda Doors and pushed on that second door in an effort to open it. At least one USCP Officer worked to keep the door closed from the outside. As Resnick and others pushed on the closed door, a different USCP Officer ("Officer B.A.") approached Resnick and attempted to stop him from pushing on the door. Another rioter (Kaleb Dillard, Crim. No. 23-CR-49 (JMC)), saw what was happening, grabbed the police officer from behind, and threw Officer B.A. to the ground. As described in the government's sentencing memo in that case, "[Officer B.A.] hit the marble floor with his head and shoulders first before sliding into a metal bench." *United States v. Dillard*, Crim. No. 23-CR-49 (JMC), ECF No. 35, p. 15. "The victim in this case, [Officer B.A.], did suffer bodily injury as a result of Dillard's assault." *Id*. at 30. But for Resnick's efforts to open that second door, Officer B.A. would not have been injured.



*Image 6: A screenshot from USCP CCV showing RESNICK just inside the Capitol's East Rotunda Doors.*



*Image 7: A screenshot from USCP CCV showing Resnick attempting to open the southern door of the East Rotunda Doors.*



*Image 7a: A close-up of Image 7 showing Resnick (in red) attempting to push open the second door, USCP Officer B.A. (yellow arrow) approaching Resnick, and a USCP officer (blue arrow) attempting to hold the door closed from the outside.*

After failing to open the second door, Resnick reached through the open northern door and pulled still more rioters into the U.S. Capitol.



*Image 8: A close-up of a screenshot from USCP CCV showing Resnick (red arrow) pulling another rioter into the U.S. Capitol.*





*Images 9 and 9a: (top) A screenshot from USCP CCV showing Resnick standing inside the U.S. Capitol and reaching out through the breached entryway to grab and pull another rioter inside; and (bottom) a close-up of that same image.*

Resnick explained that he pulled other rioters past the police line and into the Capitol

because he wanted as many people as possible to enter. He believed that the greater their numbers, the greater their chances of success.

At approximately 2:29 p.m., Resnick left the entryway just inside the East Rotunda Doors. Resnick moved west into the Grand Rotunda and then continued south towards the House Chamber. At approximately 2:29 p.m., USCP CCV captured Resnick moving south through Statuary Hall. Resnick later explained that as he went from place-to-place throughout the Capitol, he did not know where he was going. His goal was to find the politicians and yell at them about his displeasure as to what was happening with President Trump and the election.



*Image 10: A screenshot from a publicly available video[9] that shows Resnick in a second-floor hallway that leads directly to the House Chamber.*

---

[9] https://archive.org/details/nYiFQbNc65jwFYCWY at approximately 19 minutes 45 seconds.



*Image 10a: A close-up of Resnick as seen in Image 10.*

Resnick turned back north, went back through Statuary Hall, and USCP CCV captures

Resnick entering the Grand Rotunda again at 2:30:28 p.m.[10]



*Image 11: A screenshot from USCP CCV showing RESNICK in the Grand Rotunda stepping over a velvet rope between stanchions.*

---

[10] The time shown on the screenshot (19:30:28) is in Coordinated Universal Time (UTC), which in January is five hours ahead of Eastern Time. The time in this screenshot, for example, is 14:30:28 in 24-hour time, or 2:30:28 p.m.

From there, Resnick entered the Small Senate Rotunda, descended to the first floor via a staircase commonly referred to as the Supreme Court Chamber Stairs, and at 2:32:04 p.m., USCP CCV captured Resnick entering the area between the Crypt and the annex to the Capitol Visitor Center, which sits below the East Plaza. Resnick then walked around the Crypt Annex and the Crypt itself for several minutes before returning to the Annex and taking the escalator from the first floor down to the basement and the Capitol Visitor Center at 2:38:05 p.m.



*Image 12: A screenshot from USCP CCV showing Resnick in the Crypt Annex, a space between the Crypt and the stairs/escalators that lead down to the Capitol Visitor Center.*



*Image 13: A screenshot from USCP CCV showing Resnick descending into the underground CVC.*

At 2:39:25 p.m., Resnick returned to the Crypt. Resnick then went to a door that led out of the Capitol (the Law Library Door) and pushed on it. The door opened and Resnick looked outside, but he did not leave. Resnick later explained that he pushed on the door because he wanted to see if there was a guard on the other side or if it or if he could let even more rioters into the Capitol. He believed that allowing additional rioters into the Capitol would make the riot more effective, and he knew that there was a massive crowd outside just waiting to get in. Resnick did not have any concerns that bringing additional rioters illegally into the Capitol would result in more violence because, despite what he had observed at the East Rotunda Doors, he assumed people would not be violent. Resnick then wandered around the Crypt and CVC until approximately 2:44:56 p.m.



*Image 14: A screenshot from USCP CCV showing Resnick with a group of rioters in the CVC.*

At 2:45:32 p.m., Resnick took a staircase that led him from the Crypt Annex and put him back in the entryway of the Capitol, just inside the East Rotunda Doors. Once again, Resnick stood at the East Rotunda Doors and encouraged rioters outside to come inside, occasionally pulling them in and clapping them on the back as they entered.





*Images 15 (top) and 16 (bottom): Close-ups of screenshots from USCP CCV showing Resnick pulling rioters into the U.S. Capitol while at the East Rotunda Doors.*



*Image 17: A screenshot from an open-source video showing Resnick standing—for the second time—at the threshold of the East Rotunda Doors of the Capitol and pulling other rioters inside.*

By this time, Resnick had been in the Capitol for approximately twenty-three minutes. Resnick returned to the Grand Rotunda and appeared to use a cellphone in a manner consistent with taking a photograph or recording a video.

 

*Images 18 and 18a: (left) A screenshot from USCP CCV showing Resnick with a digital device out in the Grand Rotunda; and (right) a close-up of Resnick in that screenshot.*

Between 2:54 p.m. and 3:10 p.m., Resnick traveled back and forth between the East Rotunda Doors foyer and the Grand Rotunda. For much of that time, USCP and MPD officers were making a concerted effort to clear the Grand Rotunda, but Resnick did not leave the Capitol building until approximately 3:14 p.m. Altogether, Resnick remained inside the U.S. Capitol building without authorization for approximately fifty minutes.

Resnick subsequently insisted that he did not recall any police officer telling him to leave throughout his time in the Capitol building and on the Capitol grounds. Rather, he only decided to leave once he observed that there were so many police officers that he would likely be unable to get close to the politicians. He also did not want to be pepper sprayed. Resnick recalled that another rioter told him that Trump wanted the rioters to go home.



*Image 19: A screenshot from USCP CCV showing Resnick still in the Grand Rotunda, even though USCP and MPD had been attempting to clear the Rotunda for several minutes, giving loud direct commands and engaging in conflict with other rioters.*



*Image 20: A screenshot from USCP CCV showing Resnick embracing another rioter just north of the East Rotunda Doors.*



*Image 21: A screenshot from a publicly available source[11] showing Resnick as he finally left the Capitol.*

---

[11]   https://archive.org/details/capital-hill-occupy-ovfr-18/Capital+Hill+Occupy+-ovfr18.mp4   at approximately 17 min. 30 sec.

After leaving the east side of the Capitol at approximately 3:14 p.m., Resnick unlawfully remained on the Capitol grounds for at least another hour.



*Image 22: A screenshot from MPD BWC showing RESNICK with other rioters on restricted grounds on the Capitol's west side.*

### Resnick's Social Media Postings

Elliot Resnick's flirtations with extremism and violent rhetoric did not begin on January 6, 2021, and indeed, pre-date the 2020 United States presidential election. Since January 6, moreover, Resnick's social media postings demonstrate a lack of remorse for his decision to engage in illegal conduct in furtherance of his political beliefs.

For example, on January 6, 2021, Resnick's public justification for joining rioters in invading the U.S. Capitol included a challenge to explain how else they could keep the Democrats from cheating.

**January 6, 2021, at 6:37 p.m.**



**Twitter User 1:**   I understand how frustrated and upset so many people are but
we can't do what's right if we're fighting each other in the
streets. We need to take a step back, regroup and win back our
nation. #TrumpRally

**RESNICK:**   Please explain how you plan on making sure Democrats don't
cheat four years from now.

In 2022, Resnick made a post in which he implied that a violent and armed response would

be an appropriate reaction to any attempt to arrest the former president.

**August 29, 2022, at 5:31 p.m.**



If the left tries to arrest Trump, Trump should call for 50,000 of his followers to surround his house with guns.

*FBI Interview*

Pursuant to the terms of his plea agreement, Resnick agreed to an interview "regarding the events in and around January 6, 2021." Resnick described his actions as motivated in large part by a desire to ensure that police officers were outnumbered and overwhelmed. At no point during his interview did Resnick express any remorse for his unlawful conduct, but continued to suggest that those actions were justified.

## III.   THE CHARGES AND PLEA AGREEMENT

On March 14, 2023, Resnick was charged by complaint with two felony offenses (18 U.S.C. §§ 111(a)(1) (Assault of a Federal Officer) and 231(a)(3) (Civil Disorder)) and four misdemeanor offenses. ECF No. 1, 1-1. The FBI arrested Resnick on March 16, 2023.

On December 15, 2023, pursuant to the terms of a Plea Agreement, the government filed an Information charging Resnick with a single violation of 18 U.S.C. § 231(a)(3), Civil Disorder. ECF No. 21. On January 30, 2024, based on a guilty plea entered pursuant to a plea agreement, this Court convicted Resnick of that offense. ECF Nos. 25-28, Minute Entry (January 30, 2024).

## IV.   STATUTORY PENALTIES

Elliot Resnick now faces sentencing on one count of 18 U.S.C. § 231(a)(3), a class D felony. As noted by the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, the defendant faces up to five years imprisonment, a fine of $250,000, and a supervised release term of not more than three years.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Plea Agreement between the parties and the PSR make the same calculation as to Resnick's total offense level. ECF No. 31, pp. 7-8, ¶¶ 28-38; ECF No. 25, pp. 2-3, § 5(a). That Guidelines analysis follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | Involved Physical Contact | + 3 |
| | **Total** | **13** |
| U.S.S.G. § 3E1.1 | Acceptance of Responsibility | - 2 |
| | **Total (Adjusted)** | **11** |

ECF No. 25, pp. 2-3 § 5(a).

U.S.S.G. § 4C1.1 provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. In the Plea Agreement, the parties agreed that the burden is on Resnick to prove that he satisfies all the criteria in § 4C1.1 to be eligible for the adjustment, and the government reserved the right to oppose its application. The government now opposes any application of section 4C1.1 and the concordant two-level reduction because, viewing all of the circumstances in totality, Resnick encouraged others to engage in violence, and he facilitated violence and credible threats of violence against the police officers and the U.S. Capitol itself.

Violence was defined by District Court Judge Trevor N. McFadden as "[t]he use of physical force," typically "accompanied by fury, vehemence, or outrage" and "unlawfully exercised with the intent to harm." He also defined it as the "exertion of any physical force so as

to injure or abuse." *United States v. Bauer*, 21-CR-386-2 (TNM), ECF No. 195 at 4-5; *see also*

*United States v. Hernandez*, 1-CR-445 (CKK), ECF No. 65 at 5 (adopting TNM's definition of

violence from *Bauer*). Judge McFadden defined "credible threat of force" as "a believable

expression of an intention to use physical force to inflict harm." *Bauer*, ECF No. 195 at p. 6.

Evaluating whether a defendant's conduct posed a credible threat of violence requires

consideration of the totality of the circumstances:

> In evaluating whether credible threats of violence were posed by the defendant's
> offense conduct, to my mind, the context matters very critically. In other words,
> evaluating a defendant's offense conduct requires examination of all the factors of
> the offense including what the particular defendant being sentenced did; where he
> was; what he was seeing; what a person would reasonably understand was the
> volatility of the situation; the threat that whole situation would pose to others; the
> foreseeable harm of the situation; and the consequences of the specific defendant's
> individualized actions. So the fact that this defendant is not personally charged with
> assaulting or attacking officers is, therefore, not sufficient to make him eligible for
> the zero criminal history score offense-level reduction."

*United States v. Andrulonis*, Crim. No. 23-cr-85 (BAH), Sentc'g Hrg. Tr. at 11-12.

A separate police officer, U.S. Capitol Police Officer R.B. was on the East Plaza of the

Capitol as the crowd grew in the early afternoon of January 6, 2021. *United States v. Chwiesiuk*,

21-CR-536 (ACR), Trial Tr. (Aug. 9, 2024) at pp. 132-33. It was the same time that Resnick and

other rioters gathered on the East Plaza. Having worked as a Capitol Police Officer for nearly

twenty years, Ofc. R.B. noted that January 6, 2021, "felt like a completely different environment"

and that at a certain point, with a loud roar towards the officers, the crowd broke through the

barriers and charged towards the Capitol. *Id*. To Ofc. R.B., even at this relatively early stage of the

riot, this did not feel like a normal protest, a normal tourist group, or a normal day at the Capitol.

*Id*. at 134. He compared the number of police officers to the number of rioters as a "drop in the

bucket." *Id*. at 135.

Once the rioters reached the door of the Capitol, Ofc. R.B. testified that the rioters, "started

bashing, started punching on the doors, trying to get the door [ . . . ], trying to punch that door open. A sea of people go up those stairs, and they're on that final landing on the top stairs where the door is, and you just hear pounding and smashing on the doors and lots of yelling." *Id.* at 134. Seeing this seething and violent crowd attacking his outnumbered colleagues and the Capitol itself, Ofc. R.B. recalled thinking, "[Q]uite frankly, I thought I was going to die." *Id.* at 133-34.

Here, Resnick made similar observations about the crowd's size and how their overwhelming numbers worked in favor of the rioters. In his post-plea interview with the FBI, Resnick spoke of how although his decision to join the crowd storming the Capitol was spur-of-the-moment, once he joined in, he knew they had to get inside to "scream at the politicians." Resnick estimated that there were only 10-15 police officers guarding the doors. Seeing that, he thought, "I knew we could get past that number." Resnick admitted that he waved others forward and encouraged others to join him, knowing that together they could get past the "guards."

Throughout the interview, Resnick continued to use battle and siege terminology to describe what happened that day. He constantly referred to himself as being "on the front line." He referred to the police officers as "guards." Despite seeing indicia of chaos and destruction (i.e., damaged windows and doors and the smell of marijuana, smoke, and gas), and despite admitting that he knew that his own presence was illegal, Resnick spent time in the Capitol looking for ways to let *even more* people into the Capitol "so it [would be] even more effective."

More specifically, Resnick engaged in violence when he grabbed the wrist of a police officer to prevent the officer from spraying other rioters. Resnick also engaged in acts of violence when he reached across the threshold of the Capitol and pulled other rioters into the Capitol, even as the overwhelmed and outnumbered police officers were attempting to keep the same rioters out. Resnick encouraged others to engage in violence or facilitated violence by noting how badly the

"guards" were outnumbered by the rioters and still encouraging even more people forward so that they could get inside.

The U.S. Probation Office also determined that Resnick does not qualify for the Zero-Point Offender adjustment. PSR ¶ 37. Indeed, the USPO specifically overruled Resnick's objection on that point, noting that defendant's actions "created a credible threat of violence because as the defendant attempted to keep the door closed, another rioter pushed an officer to the ground" and "created a threat of violence to law enforcement officers." PSR p.21-22. In particular, the U.S. Probation Office points to Resnick's actions pushing on a closed door that led to violence against the officer who tried to stop Resnick. *Id*.

Other judges in this district have rejected the application of § 4C1.1 to January 6 defendants under similar circumstances and so declined to reduce their offense levels. In *United States v. McNulty*, Crim. No. 23-CR-235 (TSC), Judge Chutkan declined to apply the 4C1.1 reduction where the defendant observed violence against police officers on the restricted grounds of the Capitol before he himself pushed and shoved against a police officer's shield several times over a few seconds. McNulty was convicted under 18 U.S.C. § 111(a). Likewise, in *United States v. Reyher*, Crim. No. 23-CR-138 (RBW), District Judge Reggie B. Walton declined to apply the 4C1.1 reduction to two defendants, each of whom had been convicted under 18 U.S.C. § 231(a)(3). Judge Walton explained that, in sum and substance, when a defendant associates themselves with people who are engaged in violence, and they contribute, even to a lesser degree than others, they are violent.

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to

counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[12]

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010.[13] Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. For example, District Court Judge Royce C. Lamberth remarked, "The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream." *United States v. Little*, Crim. No. 21-cr-315 (RCL), ECF No. 73 at 4. As stated above, Resnick himself has shown no known remorse for his actions. On those few occasions that he has publicly mentioned January 6 or his involvement, it is only to ridicule those who have imposed

---

[12] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

[13] U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010

consequences on Resnick as a result of the allegations and conviction.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. ECF No. 31, p. 8, ¶ 41. Accordingly, based on the government's calculation of Resnick's total adjusted offense level, after acceptance of responsibility, at 11, Resnick's Guidelines imprisonment range is eight to fourteen months' imprisonment. Resnick's plea agreement contains an agreed-upon Guidelines range calculation that mirrors the calculation contained herein.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Resnick's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Resnick went to Washington, D.C., knowing that the certification was taking place, and then when the opportunity presented itself, he went into the U.S. Capitol, knowing that doing so was illegal. While there, he waved and encouraged others forward, he pushed his way to the front line, he grabbed the wrist of a police officer, and on two separate and distinct occasions, he pulled other rioters into the Capitol against the will and direction of the police officers. The entire time he was in the Capitol, he never lost sight of his goal of helping others to illegally enter the Capitol, all the time dangerously aware of the fact that the rioters outnumbered the police officers. The nature and circumstances of Resnick's offense were of the utmost seriousness, and fully support the government's recommended sentence of eleven months incarceration.

### B.  The History and Characteristics of the Defendant

The defendant is the former principal editor of a large news media publication who now spends his time caring for his aging mother and podcasting. PSR ¶ 69.  He obtained a doctorate degree in 2022. PSR ¶ 65. He is the second of three children, and his late father was a physician at Cornell Hospital and his mother a producer at NBC. PSR, p. 9, ¶ 47. Resnick's mother suffered a minor stroke in 2019. *Id*.

Resnick described his childhood and life so far as "regular." *Id*. at ¶ 49. Resnick was raised by two loving parents, with no abuse, no domestic violence, no trauma, no financial hardships, and an environment that cultivates and prioritizes education. *Id*. at ¶¶ 49-54. Resnick has never suffered from or been treated for any mental or emotional health issues, he has no known physical ailments, and he has never used alcohol, or drugs. *Id*. at ¶¶ 60-64. Despite being unemployed from 2021 through late 2023, the PSR determined that Resnick has the financial wherewithal to pay a fine in addition to restitution. *Id*. at ¶ 80. Though Resnick called it "regular," one might more aptly call Resnick's childhood and life to now as privileged and extraordinarily fortunate.

It is this level of privilege and abundance in his life that makes it all the more important that this Court impose a sentence of incarceration for Resnick. Even those with PhDs, no addiction or mental health issues, healthy bank accounts, and loving families can and should be punished by terms of imprisonment. Based on all of those advantages, Resnick surely understood that violently storming the U.S. Capitol was not the way to seek redress for his political concerns—yet he enthusiastically participated in physically and violently confronting and interfering with the police officers attempting to defend Congress against overwhelming numbers.

In some cases, a single decision leads to criminal consequences. The pull of a trigger, the turn of the key in the ignition after too many drinks. Resnick, however, had many moments in which he could have and should have turned back and not continued with his illegal activity. From

the moment he set foot on restricted Capitol grounds, Resnick was committing a crime. He continued across the grounds and up to the Capitol. When he saw that the officers were overwhelmed and retreating up the stairs, he got excited and encouraged others to surge forward. When there was a standoff at the East Rotunda Door, he stood his ground and grabbed the wrist of a police officer. When a door opened, he went inside and then turned and started pulling others through. He wandered around the Capitol for a period, *looking for members of Congress*. Unable to find any, he returned to the East Rotunda Door and pulled more people through. When he was finally pushed out, he did not leave, but went around to the West side where the violent battle between rioters and police raged on. Resnick made a series of conscious, deliberate, and deliberately bad choices that led him to where he is now.

The PSR identified Resnick's alleged status as a caretaker for his mother as factor "that would warrant a variance from the applicable guideline range." PSR, p. 19, ¶ 105. The government respectfully disagrees and encourages the Court to view this claim with skepticism. Longstanding D.C. Circuit precedent supports the government's position, advising emphatically that "departures on such a basis [family responsibilities] should be rare." *United States v. Dyce*, 91 F.3d 1462 (1996); *see also United States v. Gaskill*, 991 F.2d 82 (3d Cir. 1993) (defendant was the sole provider for his wife, who had been manic-depressive for 30 years and was unable to leave the house or take care of herself); *United States v. Pena*, 930 F.2d 1486, 1494-95 (10th Cir. 1991) (defendant, a single mother, was steadily employed and was the source of support for an infant, a 16-year-old daughter, and the latter's infant). The Sentencing Commission has a statutory mandate to "assure that the guidelines and policy statements, in recommending a term of imprisonment or length of a term of imprisonment, reflect the general *inappropriateness* of considering the education, vocational skills, employment record, *family ties and responsibilities*, and community

ties of the defendant." 28 U.S.C. § 994(e) (emphasis added).

Resnick's mother's stroke occurred in 2019, two years prior to the events of January 6, 2021. His caretaking responsibilities existed when he chose to travel to Washington, D.C., and made each of the decisions mentioned above. Resnick has two siblings (one in California and the other in New York), both of whom appear to maintain a close relationship with their brother and their mother. The PSR has not evaluated whether either or both of Resnick's siblings could assume his caretaking responsibilities during an eleven-month sentence. Resnick's mother also has strong ties to her local community and has remained employed as the Director of the Senior Social Club of KAJ in the five years since her minor stroke. The PSR has not verified what level of support she could receive from her community should this Court impose a term of incarceration. At any rate, as explained in *Dyce*, family responsibilities should not even be a consideration unless and until it has been established that the circumstances are *extraordinary*. *United States v. Dyce*, 91 F.3d at 1466. There has been no attempt here to establish that Resnick's responsibilities vis-à-vis his mother are extraordinary, especially where other family members could reasonably assume those responsibilities, and a term of incarceration remains appropriate in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Resnick's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.  The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[14] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this defendant also weighs heavily in favor of a term of incarceration.

As discussed, Resnick has yet to show any kind of remorse for his behavior on January 6, 2021. This stands in stark contrast to the professions of remorse and regret from other January 6 defendants. For example, after pleading guilty to a misdemeanor and in anticipation of his sentencing, Leonard Gruppo wrote a six-page letter to Judge Howell expressing deep contrition and remorse for his actions. *United States v. Leonard Gruppo*, 21-CR-391 (BAH), ECF No. 28-2 (Oct. 19, 2021). "I'm sorry. I have been sorry. If I am to be made an example and held up as a deterrent for others, let me assure anyone paying attention, please don't do what I did or anything like that, or you will suffer greatly, and your life will be ruined. Follow the rules. Follow the laws. Love one another. I say this as I desperately cling to the remnants of what was until recently, an exceptionally productive and useful life, a life I hope that the court will deem worth salvaging." *Id*. at p. 6. Nearly three years later, in anticipation of the sentencing of his wife, Gruppo wrote another letter expressing again what appears to be contrition and remorse. *United States v. Leah Gruppo*, 24-CR-160 (TSC), ECF No. 18. "We touched nothing and no one. Yet we were there, and that has proved a seminal event in our lives for which we regret our involvement deeply and are very sorry to have participated at all." *Id*. at p. 18.

Should the former president call on his supporters to once again engage in violent and

---

[14] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

extreme acts on his behalf, there is currently a high likelihood that Resnick would answer that call. A sentence of straight probation would do nothing to deter Resnick from engaging in future political violence. A term of imprisonment of eleven months would give him some time to reflect and perhaps help him to think twice before doing something like this ever again.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.  Unwarranted Sentencing Disparities

18 U.S.C. § 3553(a)(6) directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[16]

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022. Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Gordon*, 22-CR-343 (RC), this Court sentenced the defendant after he—like Resnick—pleaded guilty to a single violation of 18 U.S.C. § 231(a)(3). Like Resnick, Gordon travelled to Washington, D.C., attended the rally, and then made his way to the Capitol. Unlike Resnick, however, Gordon never fought his way inside the Capitol building. Gordon admitted that he went to the North Door of the Capitol, and that around 4:08 p.m., he repeatedly threw a large projectile at the North Door. Gordon also yelled obscenities at law enforcement and kicked the doors. *Id*. at ECF No. 26. Because of his criminal history, Gordon's sentencing guidelines were 12 to 18 months, the government recommended 18 months, and this Court imposed a sentence of six months incarceration. *Id*. at ECF Nos. 34, 36.

Numerous factors were present in *Gordon* that are not present here. Gordon's life, as described by his attorney, was "marked by misfortune and tragedy." *Id*. at ECF No. 35, p. 7. By the time January 6, 2021, came around, Gordon had been struggling for 20 years with addiction, mental health, and recurring incarceration. By the time of his sentencing, however, he had gotten sober, found faith, earned several certificates, and dedicated his life to helping others break the chain of addiction. He made significant changes to his life and had made several meaningful expressions of remorse. While Resnick did complete his doctorate in 2022 and has continued to live with his mother, he appears not to have taken any significant steps forward in his life. Whatever considerations the Court may have given to Gordon likely do not apply to Resnick.

---

To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

Significantly, the impact of Resnick's conduct was far greater than that of Gordon. By the time Gordon arrived at the North Door, the balance of power between rioters and police had shifted firmly in the direction of law enforcement. The U.S. Capitol Police had received reinforcements from MPD and other state and local police agencies. The Capitol had been cleared of rioters and was in the process of being secured. Rioters were in the process of being pushed off the restricted Capitol grounds. In contrast, when Resnick and the riotous crowd around him swarmed up the steps of the East Front, that huge and angry mob faced only a small handful of officers. Resnick's actions in grabbing a police officer's wrist and pulling rioters into the Capitol came at a time when the fate of the Capitol was still very much in play. While both engaged in reprehensible conduct, Resnick's criminal acts came at a more consequential time—indeed, Resnick urged more rioters to enter the Capitol to further tilt the field against the police. Resnick's conduct was more culpable and should be weighed more heavily against him.

Michael Asbury and Nathan Baer (23-CR-236 (RC)), who were sentenced by this Court on August 26 and September 6, 2024, respectively, both pleaded guilty to 18 U.S.C. § 231(a)(3). In both cases, the adjusted total offense level was 11, and both defendants had a criminal history category of I. The government recommended sentences of eleven months incarceration for each, and in each case this Court sentenced each defendant to four months incarceration to be followed by two years supervised release, the first four months of which were to be spent on home detention. During the sentencing hearing of Asbury, the Court specifically remarked that it had sentenced Patrick Bournes (23-CR-35 (RC)) to four months incarceration with four months of home detention after that defendant pleaded guilty to 18 U.S.C. § 231(a)(3).[17] Resnick's conduct is distinguishable. The conduct of those three defendants took place in the Tunnel where rioters were

---

[17] The government also recommended a sentence of eleven months incarceration in *Bournes*.

attempting to get inside the Capitol. Resnick went inside the Capitol and then helped to pull several other rioters in with him. With these data points in mind, however, this Court seems poised to impose the same or a substantially similar sentence on Resnick. The government respectfully believes that an eleven-month term of incarceration for Resnick is sufficient but no greater than necessary to meet the sentencing objectives outline in 18 U.S.C. § 3553(a)(2). Nonetheless, with these specific sentences in mind, the government believes this Court should sentence Resnick at a minimum to a sentence that is comparable to those that it issued in the cases of Asbury, Baer, and Bournes.

Another similar case is that of Aaron Mostofsky, a fellow New York City resident, also in his mid-thirties, who also pleaded guilty to 18 U.S.C. § 231(a)(3). *United States v. Mostofsky*, 21-CR-138 (JEB). Mostofsky, however, also pleaded guilty to 18 U.S.C. §§ 641 (Theft of Government Property) and 1752(a)(1) (Entering or Remaining in any Restricted Building or Grounds). The government recommended a sentence of fifteen months' incarceration (middle of the guidelines), and the Court sentenced the defendant to eight months of incarceration (low end of the guidelines). *Id*. at ECF Nos. 100, 110. In that case, defense counsel submitted 25 different character letters with his sentencing memorandum. *Id*. at ECF No. 101-1.

Like Resnick, Mostofsky engaged directly with police officers while outside and then entered the Capitol. Like Resnick, Mostofsky's actions were early in the riot and played a part in the early successes of the rioters over the police. Like Resnick, Mostofsky was originally charged with an assault but allowed to plead to a 231(a)(3) as part of plea negotiations. While Chief Judge Boasberg's sentence came in below the government's recommended sentence of fifteen months, the government believes that it is a close enough comparator to where a term of incarceration of eleven months for Resnick would not represent an unwarranted sentence disparity.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[18] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The victims in this case, Sergeant D., and Officer B., did not suffer bodily injury because of Resnick's actions. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Resnick must pay $2,000 in restitution, which reflects in part the role Resnick played in the riot on January 6.[19] ECF No. 25, p. 8, § 13. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the

---

[18] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[19] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Capitol and other governmental agencies as of July 2023. *Id*. Resnick's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. ECF No. 31, p. 19, ¶¶ 102-03.

## VIII.   FINE

The defendant's convictions for a violation of 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $4,000 to $40,000 U.S.S.G. § 5E1.2(c).

IX.     **CONCLUSION**

For the reasons set forth above, the government recommends that the Court impose a sentence of eleven months' incarceration, two years' supervised release, $2,000 in restitution, and the mandatory special assessment fee of $100.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

Sean P. Murphy
Assistant United States Attorney